IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| In re:  THE FREE LANCE-STAR PUBLISHING CO.<br>OF FREDERICKSBURG, VA, *et al.*,<br><br>Debtors. | Case No. 14-30315-KRH<br>Chapter 11<br>(Jointly Administered) |

---

| | |
|---|---|
| DSP ACQUISITION, LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE FREE LANCE-STAR PUBLISHING CO.<br>OF FREDERICKSBURG, VA, and<br>WILLIAM DOUGLAS PROPERTIES, LLC<br><br>Defendants. | APN 14-03038-KRH |

---

## MEMORANDUM OPINION

Before the Court are cross motions for summary judgment (the "Motions") filed by Plaintiff DSP Acquisition, LLC ("DSP"), and by Defendants The Free Lance-Star Publishing Company of Fredericksburg, VA ("The Free Lance-Star") and William Douglas Properties, LLC ("William Douglas" and, together with The Free Lance-Star, the "Debtors"), seeking summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, as incorporated by Rule 7056 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). The Motions concern the validity, extent, and priority of liens held by DSP on certain of the Debtors' assets.

The Court conducted a hearing on the Motions on March 24 and 25, 2014 (the "Hearing"). Finding that DSP does not have valid, properly-perfected liens on the Debtors'

Tower Parcels or the improvements thereon, the Debtors' other Tower Assets including the leases and rents derived therefrom, the Debtors' FCC licenses, the Debtors' rolling stock, the Debtors' insurance policies, the Debtors' bank accounts, or any of the proceeds that may be derived from the disposition of any of the forgoing assets, the Court will deny the motion for summary judgment filed by DSP and grant partial summary judgment in favor of the Debtors. This Memorandum Opinion sets forth the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.[1]

On January 23, 2014 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code. 11 U.S.C. §101 *et. seq.* (the "Bankruptcy Code"). The Debtors' bankruptcy cases are being jointly administered pursuant to the Court's Order of January 30, 2014. The Debtors are continuing to operate their business as Debtors-in-Possession ("DIP") under §§ 1107 and 1108 of the Bankruptcy Code.

On March 10, 2014, DSP filed the Complaint (the "Complaint") initiating this Adversary Proceeding No. 14-03038 (the "Adversary Proceeding"). The Complaint seeks a declaration that DSP has valid and perfected liens on substantially all of the Debtors' assets including the Tower Assets.[2] Later that same day, DSP filed its motion seeking summary judgment on all counts set forth in its Complaint (the "Plaintiff's Motion for Summary Judgment"). DSP also filed the

---

[1] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. *See* Fed. R. Bankr. P. 7052.

[2] The Debtors own and operate four radio stations in addition to its printing and newspaper businesses. The Tower Assets are employed in broadcasting activities associated with the Debtors' operation of its radio business. The Tower Assets include the Tower Parcels and the improvements thereon; certain equipment located on the Tower Parcels; all permits issued to the Debtors relating to the ownership or operation of the foregoing assets; all contracts related to the Tower Assets that are designated to be assumed; any counterclaims, setoffs, or defenses that the Debtors may have with respect to any assumed liabilities designated by the purchaser of the Tower Assets; all of the Debtors' insurance policies insuring the Tower Real Property or the other Tower Purchased Assets, to the extent assignable; all of the Debtors' indemnification rights under or with respect to the Assumed Liabilities or other Tower Purchased Assets; and certain documents relating to the Tower Assets or to the Assumed Liabilities.

2

Declaration of Allyson Brunetti in support of the Complaint and in support of Plaintiff's Motion for Summary Judgment (the "Declaration in Support").[3]  The Debtors, who are the named defendants in the Complaint, filed their own cross motion for summary judgment against DSP.

The Court has subject-matter jurisdiction over the Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference from the United States District Court for the Eastern District of Virginia dated August 15, 1984.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (C), (K), and (O).  Venue is appropriate pursuant to 28 U.S.C. § 1409.

### Standard of Review

Summary judgment "is favored as a mechanism to secure the 'just, speedy, and inexpensive determination' of a case" when the requirements of Rule 56 of the Federal Rules of Civil Procedure are met.  *Thompson Everett, Inc. v. Nat'l Cable Adver., L.P.*, 57 F.3d 1317, 1322-23 (4th Cir. 1995) (quoting Fed. R. Civ. P. 1).  Summary judgment should be granted "if the pleadings, the discovery disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  The relevant inquiry on summary judgment is:

> whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. An otherwise 'properly supported motion for summary judgment' will not be defeated by the existence of merely any factual dispute, no matter how minor; rather, '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'  To withstand a summary judgment motion, the non-moving party must produce competent evidence sufficient to reveal the existence of a genuine issue of

---

[3]  An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated. Fed. R. Civ. P. 56(c)(4). The Declaration in Support was found to be both false and misleading. *See* Order and Memorandum Opinion on Emergency Motion for Reconsideration of even date filed herein.

material fact for trial.  Neither conclusory allegations, speculative scaffolding of
one inference upon another, nor the production of a 'mere scintilla of evidence' in
support of the nonmovant's case suffices to forestall summary judgment.

*Moody v. Arc of Howard Cnty., Inc.*, 474 F. App'x 947, 949 (4th Cir. 2012) (citations omitted).

The party moving for summary judgment bears the initial burden of showing there exists

no genuine issue of material fact.  *Celotex*, 477 U.S. at 322.  In determining whether this

showing has been made, the Court must assess all evidence in the light most favorable to the

nonmoving party.  *See, e.g., Chabornnages de France v. Smith*, 597 F.2d 406 (4th Cir. 1979).

"[O]nce the moving party has identified the absence of a genuine issue of material fact, the

nonmoving party bears the burden of identifying specific facts that demonstrate the existence of

a genuine issue for trial."  *Hopkins v. Horizon Mgmt. Servs., Inc.*, 302 F. App'x 137, 139 (4th

Cir. 2008).

## Facts

The Free Lance-Star is a family-owned publishing, newspaper, radio, and

communications company located in Fredericksburg, Virginia (the "Company").  William

Douglas is a related entity that owns a portion of the land on which The Free Lance-Star operates

its business.  The Free Lance-Star owns the Tower Assets, which include three parcels of real

estate (the "Tower Parcels").  The Tower Assets are used predominately in The Free Lance-

Star's radio broadcasting operations.  The first of the Tower Parcels is located at 122 Mountain

Avenue in Stafford County, Virginia.  The second of the Tower Parcels is located at 6701

Rumsey Lane in Spotsylvania County, Virginia.  The third of the Tower Parcels is located at

22601 Penola Road in Caroline County, Virginia.  Between 1988 and 1998, The Free Lance-Star

improved the Stafford County Tower Parcel by constructing a guy wired mast on the property.

Towers were already erected on the Spotsylvania County and Caroline County Tower Parcels

4

when the Debtors purchased those properties (collectively, the masts erected on the Tower Parcels, the "Towers").

In 2006, the Debtors developed a plan to expand their commercial printing business. To undertake this expansion, the Debtors borrowed funds from Branch Banking and Trust ("BB&T") in the approximate amount of $50.8 million (the "Loan"). To secure this Loan the Debtors granted liens on, and security interests in, certain of the Debtors' real and personal property. The Debtors did not agree to grant any liens on, or security interests in, the Tower Assets, nor did BB&T record deeds of trust covering the Tower Parcels. BB&T did not obtain or record any assignment of leases or rents concerning the Tower Parcels. The Credit Agreement makes no reference to granting liens on the Tower Assets, nor does the Security Agreement specifically reference the Tower Assets. It appears that during the time that BB&T held the Loan, BB&T did not record any financing statements perfecting a security interest in any of the Tower Assets.

With the Loan, the Debtors built a state-of-the-art printing facility that began operation in 2009. Construction of the facility coincided with the severe recession that began in December 2007 and ended in June 2009. In early 2009, the Company fell out of compliance with certain of the Loan covenants contained in its Loan Agreement with BB&T. In December of 2011, the Company signed a Forbearance Agreement with BB&T. The Company continued to make timely payments to BB&T throughout this period even as its revenue declined. Prevailing economic conditions, however, prevented the Company from restructuring its business and becoming compliant with its Loan covenants. The Company was unsuccessful in its attempts to

5

obtain replacement refinancing.  Finally, in late June of 2013, BB&T sold its Loan to Sandton Capital Partners ("Sandton").[4]

On July 3, 2013, Sandton informed the Debtors that it wanted the Company to file a Chapter 11 bankruptcy case and sell substantially all of the Debtors' assets pursuant to 11 U.S.C. § 363.  Sandton indicated that it intended to be the entity that purchased the Debtors' assets at the bankruptcy sale.  Sandton advised that it would continue to operate the business and that it intended to keep the Debtors' management in place.  Thereafter, the Debtors agreed to work with DSP on implementing a plan that would involve the Debtors filing a Chapter 11 bankruptcy case and selling all of their assets to DSP pursuant to 11 U.S.C. § 363, so long as it was done in the best interests of the estate, and was within the fiduciary duties of the Debtors' officers and directors.

On or about July 25, 2013, the Debtors received, on behalf of DSP, a request that the Debtors execute three deeds of trust to encumber the Tower Parcels.[5]  On or about August 8, 2013, counsel for DSP provided a "Restructuring Timetable" that contained an expectation for the timely recordation of the executed deeds of trust and a September 2013 bankruptcy filing. Over the next several days, email correspondence concerning the "Restructuring Timetable" continued.  Communication between the parties stopped abruptly in mid-August.  Unbeknownst to the Debtors, during the several weeks of ensuing silence, DSP unilaterally recorded UCC Fixture Filings in Caroline County, Stafford County, and Spotsylvania County.  DSP was the first entity since the Loan's inception to attempt to perfect a security interest in the Debtors'

---

[4]  Counsel for DSP represented at the Hearing that DSP is an affiliated entity operated by Sandton Capital Partners and that DSP is now the holder of the Draw Commercial Note dated September 11, 2007, made by the Debtors payable to the order of BB&T in the original principal amount of $45,842,400.00.

[5]  These deeds of trust sought to expand the scope of the initial Security Agreement entered into between BB&T and the Debtors by granting consensual liens on the Debtors' Tower Parcels and the improvement thereon.

Tower Assets. The financing statements purported to perfect a security interest in, among other things, "all machinery, equipment, fixtures, and other property of every kind and nature whatsoever owned by the Debtor . . . located upon the [Tower Parcels]."

Negotiations between DSP and the Debtors resumed 90 days after the UCC Fixture Filings were recorded. On January 11, 2014, DSP contacted counsel for the Debtors and informed them that DSP no longer supported a bankruptcy filing under the terms proposed by the Debtors. DSP advised that it would be suspending all work in connection with the bankruptcy filing. The next week, DSP recorded additional financing statements in various jurisdictions without giving any notice to the Debtors. The Debtors commenced the bankruptcy case without the support of their secured lender.

## Analysis

DSP does not have a perfected security interest in all of the assets upon which it asserts liens. The uncontroverted evidence indicates that the Debtors did not intend to grant, and BB&T did not intend to receive, a lien on the Tower Assets. There are no deeds of trust recorded among the land records of Stafford County, Spotsylvania County, or Caroline County (where the Tower Parcels are located) from the Debtors for the benefit of BB&T. There exist no assignments of leases or rents pertaining to the Tower Parcels. The Security Agreement between the Debtors and BB&T fails to reference the Tower Assets. The financing statements obtained by BB&T were recorded locally only in the City of Fredericksburg and centrally at the State Corporation Commission. BB&T's financing statements of record specifically limit the coverage of fixtures to those located on defined parcels of real property, all of which are located within the confines of the City of Fredericksburg. BB&T never asserted a lien on, nor attempted to file any fixture filing against, the Tower Parcels located in the surrounding counties.

DSP musters the simplistic argument that the Security Agreement granted a blanket lien over all the Debtors' assets. "All assets" of the Debtor, according to DSP, necessarily included the Tower Assets. DSP assumes that the Towers erected on the Tower Parcels are fixtures. The defined term "equipment" as used in the Security Agreement[6] includes fixtures. From this broad definition of equipment, DSP jumps to the conclusion that the Debtors conveyed a lien on the Tower Assets.

DSP concedes, as it must, that it is the intent of the parties that controls. The Court can glean that intent from the Loan Documents as well as from the conduct of the parties. Had the Debtor and BB&T intended to give a security interest in the Tower Assets, those parties certainly would have included this language in the Security Agreement. The Commitment Letter for the Loan issued by BB&T clearly identifies the Tower Assets and reveals an initial intent to take a security interest in them. During the ensuing negotiations, BB&T acquiesced and ultimately agreed to make the Loan without a lien on the Tower Assets. As a result, the language employed in the Loan Agreement and the Security Agreement is starkly different from that contained in the Commitment Letter.[7] The executed Loan Documents reflect the agreement between the Debtors and BB&T that there would be no secured liens in Caroline, Spotsylvania, or Stafford Counties. *See* Affidavit of Josiah P. Rowe, III.

---

[6] The Security Agreement defines equipment as: "all goods (other than inventory, consumer goods, and farm products) now owned or hereafter acquired by the Borrower, including all items of machinery, equipment, furnishing, and fixtures of every kind, whether affixed to real property or not, as well as all automobiles, trucks, and vehicles of every description, trailers, handling and delivery equipment, all additions to, substitutions for, replacements of or accessions to any of the foregoing, all attachments, components, parts (including spare parts) and accessories whether installed thereon or affixed thereto and all fuel for any thereof."

[7] The provisions of the Commitment Letter did not survive closing. *See* ¶ 9.10 of the Secured Credit Agreement which provides: "This Agreement, the Notes and the Collateral Documents set forth the entire agreement of the parties with respect to the subject matter hereof and thereof and supersede all previous understandings, written or oral, in respect thereof."

8

Paragraph 3.4 of the Security Agreement[8] qualifies the grant of the alleged blanket lien upon which DSP relies. There the parties acknowledged that once the actions required in paragraph 4.1 had been completed, BB&T would have perfected liens on all the collateral it expected to receive in connection with the Loan. The Tower Assets are notably omitted from the schedule of filings and recordings referenced in paragraph 4.1. BB&T never took any action inconsistent with this stated understanding. BB&T never filed documentation showing any intent to assert a security interest in the Tower Assets. It took no action to perfect any such lien when the Loan was made. It made no effort to shore-up any perceived "inadvertent" omission of this collateral as part of the Forbearance Agreement. The Court finds that the parties never intended for the Tower Assets to be included in the grant of collateral set forth in the Security Agreement. The Debtors never gave BB&T a security interest in the Tower Assets.

But even if this evidence was to the contrary and the Court could discern some intent to grant a lien on the Tower Assets, no such lien was ever perfected. In order for a security interest to become enforceable against third parties, the security interest must attach and it must be perfected. *See* Va. Code Ann. §§ 8.9A-203(a) and 8.9A-301 *et seq.* BB&T failed to perfect a lien or security interest in fixtures, personal property, or real estate in any locality outside the City of Fredericksburg, Virginia.

DSP's subsequent UCC Fixture Filings are ineffective. BB&T did not have a security interest in the Tower Assets either at the commencement of the Loan, nor when it sold its Loan to DSP. As such, DSP also lacked a security interest in the Tower Assets. A secured creditor may not expand the scope of its security interest by filing financing statements. *See, e.g., In re*

---

[8]   That provision states that "[b]y complying with section 4.1, the Borrower will have created a valid security interest in favor of the Bank in all existing Collateral and in all identifiable Proceeds of such Collateral. . . ."

*Amex-Protein Dev. Corp.*, 504 F.2d 1056, 1061 (9th Cir. 1974). Furthermore, the Tower Parcels and the improvements thereon were not personal property susceptible to perfection through fixture filings. The structures on the Tower Parcels are permanent improvements to the real property. The only way DSP could have obtained a lien on the Tower Assets was through the recordation of properly executed deeds of trust in its favor, not through fixture filings.

Despite its early recognition of this fact, as evidenced by its attempts to procure deeds of trust on the Tower Parcels, DSP now disagrees. It cites to *CSB, Inc. v. Cradle of Democracy Broad. Co.*, 547 F.Supp. 106 (E.D. Va. 1982) for the proposition that the Towers are personal property and are therefore covered by the Security Agreement as fixtures. *CSB* is readily distinguished from the case at bar. In *CSB*, the transmission tower at issue was the subject of a lease.[9] The lease in *CSB* provided that the tower was removable at the end of the lease term at the defendant's option. *CSB, Inc.*, 547 F.Supp. at 109. Here the Debtors own the real property on which the Towers and other improvements are erected. There is no evidence that the Towers are moveable. There is no evidence that owners intended to treat the Towers as personalty.

Rather, the evidence points to the contrary, that the Towers are improvements to and a part of the realty. A chattel ceases to be personal property when it becomes (i) actually or constructively annexed to realty; (ii) actually or constructively adapted to realty; and (iii) intended by the owner to be part of the realty. *Danville Holding Corp. v. Clement*, 178 Va. 223, 232 (Va. 1941); *see also State Highway and Transp. Comm'r v. Edwards Co., Inc.*, 220 Va. 90 (1979). While each factor of the *Danville* test is significant, the final factor, the intention of the owner of the chattel to make it a permanent addition to the property, is the paramount and

---

[9]  The defendant was the lessee, and by an express written provision in the lease, the tower was removable at the defendant's option upon expiration of the lease.

controlling factor. *Danville,* 178 Va. at 233. A presumption arises whenever structures are annexed to real property by the owner of the realty, that the annexation is for the permanent enhancement and improvement of the realty. *See In re Shelton,* 35 B.R. 505, 510 (Bankr. E.D. Va. 1983).

The Towers were already a part of the real estate at the time BB&T made its Loan to the Debtors. The uncontroverted evidence was that the Towers are large structures embedded on concrete slabs and rising to heights of several hundred feet. The Debtors acquired two of the parcels with the Towers already constructed on them.[10] The Towers are integral to the purpose and use of the real property and their removal would be extremely difficult and cost prohibitive. Under both the *Shelton* presumption and the *Danville* test, the Towers were intended to be, and properly are, classified as improvements to realty. Given that the Towers are improvements to the realty, DSP's subsequent UCC Fixture Filings are of no moment. DSP did not acquire a lien on the Tower Assets as a result of its surreptitious Fixture Filings.

DSP does not have a perfected lien on the Debtors' motor vehicles. While arguably included within the scope of the Security Agreement, BB&T chose (for whatever reason) not to perfect a security interest in the Debtors' vehicles. The Debtors are in possession of the original certificates of title issued by the Department of Motor Vehicles for each of the vehicles. There is no lien notation on any of the title certificates. As such, DSP does not have a perfected security interest in the vehicles.[11]  *See* Va. Code Ann. § 46.2-636 ("[T]he certificate of title issued by the

---

[10]  The Towers on those parcels were conveyed to the Debtors by deed as part of the real estate. The earliest a security interest related to the Loan could have attached to the Towers would have been in 2007 when BB&T originated the Loan.

[11]  Article 9 of the UCC does not apply to the creation, perfection, priority or enforcement of a security interest in motor vehicles. *See* Va. Code Ann. § 8.9A-109(c)(2) ("This title does not apply to the extent that: another statute of this Commonwealth expressly governs the creation, perfection, priority or enforcement of a security interest created

Department to the owner of the vehicle shall show all security interests. . . ."); *see also* Va. Code Ann. § 46.2-638 ("A certificate of title, when issued by the Department showing a security interest, shall be adequate notice to the Commonwealth, creditors, and purchasers that a security interest in the motor vehicle exists. . . .").

The Debtors own four life insurance policies issued by Northwest Mutual. The Debtors never effected, nor did Northwest Mutual ever consent to, an assignment of these policies to BB&T. Accordingly, BB&T did not receive a lien on the policies and DSP did not obtain an assignment of any such lien from BB&T. *See* 44 Am. Jur. 2d *Insurance* § 790 ("To constitute a valid assignment of life insurance, there must be delivery of the policy, or of a written assignment of it, to the assignee or to a third person as agent for, or for the benefit of, the assignee."); *see also Couch on Insurance* 3d §§ 36:28 to 36:38; *see, e.g. Dennis v. Aetna Life Ins. & Annuity Co.,* 873 F.Supp. 1000, 1005 (E.D. Va. 1995); *Fid. & Deposit Co. v. Moore,* 177 Va. 341, 14 S.E.3d 307 (1941). Similarly, DSP does not have a control agreement with the banks at which the Debtors maintain their accounts. Accordingly, DSP does not have a perfected security interest in the Debtors' bank accounts. *See* Va. Code Ann. § 8.9A-104, 314, 327.

DSP asserts in the alternative that it has a valid, properly perfected security interest in the proceeds that will be realized from the sale of these assets. "A security interest in proceeds is a perfected security interest if the security interest in the original collateral was perfected." Va. Code Ann. § 8.9A-315(c). A security interest will attach to identifiable proceeds of collateral. Va. Code Ann. § 8.9A-315(a)(2). The Bankruptcy Code precludes DSP from asserting a perfected lien on the proceeds of any assets the Debtor may sell unless DSP had a perfected lien

---

by this Commonwealth or a governmental unit of this Commonwealth.") The creation of a security interest in motor vehicles is expressly governed by Va. Code Ann. § 46.2.

on the underlying asset being sold as of the Petition Date.  11 U.S.C. § 552(b)(1).[12]  As DSP does

not have a valid, properly perfected pre-petition lien on the motor vehicles or on the life

insurance policies, § 552 of the Bankruptcy Code prevents DSP from claiming any lien on any

proceeds that may be realized from the sale of those assets.  *In re Bumper Sales, Inc.*, 907 F.2d

1430, 1437 (4th Cir. 1990).

DSP argues that its pre-petition lien on general intangibles is properly perfected and this

lien qualifies it to the exception under § 552(b) of the Bankruptcy Code for a lien on the

proceeds of the sale contemplated under § 363 of the Bankruptcy Code.  Virginia's UCC defines

"general intangible" to mean "any personal property, including things in action, other than

accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods,

instruments, investment property, letter-of-credit rights, letters of credit, money, and oil, gas or

other minerals before extraction.  The term includes payment intangibles and software."  Va.

Code Ann. § 8.9A-102.  DSP contends that the anticipated sales proceeds constitute payment

intangibles.  Courts have interpreted this category of collateral narrowly and only "through a

process of elimination" where the collateral "does not come within any other definition."  *See,*

*e.g., In re E-Z Serve Convenience Stores, Inc.*, 299 B.R. 126 (Bankr. M.D.N.C. 2003), *aff'd*

*Hutson v. CIT Group/Bus. Credit, Inc. (In re E-Z Serve Convenience Stores, Inc.)*, 318 B.R. 637

(M.D.N.C. 2004).  Such a narrow interpretation is necessary to avoid the very type of circular

reasoning DSP now advances.

---

[12]  According to § 552(a) of the Bankruptcy Code "property acquired by the Debtor or the estate after
commencement of the case, is not subject to any lien resulting from any security agreement entered into by the
debtor *before the commencement of the case.*"  The exception to this rule provided under § 552(b) of the
Bankruptcy Code applies where a "security interest created by such security agreement extends to property of the
debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such
property."  11 U.S.C. § 552.

13

The collateral in the case at bar clearly does fall under "other definition[s]." Virginia law already provides a clear method for lenders to attach and perfect interests in motor vehicles, which interest DSP does not have. If the Court were to adopt DSP's expanded interpretation of general intangibles, the term would supplant Virginia's law with respect to attaching and perfecting interests in motor vehicles merely because such property became subject to a contract for sale. The same result would occur if the Court accepted DSP's argument with respect to other types of recognizable collateral such as insurance policies, money, or deposit accounts. A general intangible should be narrowly restricted to "personal property that does not come within any other definition," not as a means for supplanting established law governing other types of collateral. *E-Z Serve*, 299 B.R. at 131. The proceeds at issue derive from collateral that does not constitute payment intangibles. Furthermore, there is nothing in the record that would suggest that the Debtors and BB&T intended for proceeds from the sale of these other defined items to be included under the wide umbrella of the term "general intangibles."

DSP concedes that it does not have a lien on the FCC licenses. FCC licenses themselves are not subject to a secured lender lien. *See* 47 U.S.C. § 310(d); *Sprint Nextel Corp. v. U.S. Bank Nat'l Assn. (In re Terrestar Networks)*, 457 B.R. 254, 265 (Bankr. S.D.N.Y. 2011) (taking the position that "no security interest could attach to an FCC broadcast license in any manner"); *see Kidd Comm'ns v. F.C.C.*, 427 F.3d 1, 5 (D.C. Cir. 2005) (recognizing that the FCC has consistently held that an FCC broadcast license is not subject to a "mortgage, security interest, or lien"). DSP argues that it has a right to credit bid on the FCC licenses due to its asserted security interest in the proceeds of the FCC licenses. While there are cases, such as *In re Terrestar Networks*, that have ruled that the economic value from the sale of FCC licenses may be subject to a secured lender's lien, any lien that might be recognized on the proceeds from the sale of

14

FCC licenses would not support an entitlement to credit bid on the licenses themselves. *See In re Ridgely Commc'ns, Inc.*, 139 B.R. 374, 379 (Bankr. D. Md. 1992). In order to credit bid on the FCC licenses, DSP would need to have a security interest on the underlying licenses, which it does not.

*Terrestar* dealt with a factual scenario that was very different from that presented here. The Security Agreement in *Terrestar* expressly provided for the right to "receive monies, proceeds, or other consideration in connection with the sale, assignment, transfer, or other disposition of any FCC Licenses." *See In re Terrestar Networks*, 457 B.R. at 258. The Debtors and BB&T failed to include the Debtors' FCC licenses, or disposition thereof, in their Security Agreement.[13]   Quite to the contrary, the definition of "licenses" employed in the Security Agreement limited the term to trademarks and patents. The fact that any reference to the FCC licenses was omitted from the defined term "licenses," suggests that there was no intent by the Debtor or BB&T to grant a security interest in the FCC license proceeds.

DSP's argument that it has a security interest in the FCC license proceeds also fails under 11 U.S.C. § 552 for the same reasons as the Court has previously addressed in the context of the Debtors' motor vehicles and insurance policies.[14]   As DSP does not have a security interest in the FCC licenses, § 552 of the Bankruptcy Code prevents it from obtaining a security interest in the FCC license proceeds.

---

[13]   *Terrestar* would suggest that that the economic interest associated with FCC licenses can become subject to a secured creditor's lien only when the security agreement clearly distinguishes such economic interest from the FCC license.

[14]   *See supra* note 12, and accompanying text.

15

## Conclusion

DSP does not have valid, properly perfected liens on or security interests in the Debtors'

Tower Assets, motor vehicles, FCC licenses, insurance policies, or bank account deposits.

DSP's lien on general intangibles does not give it a lien on the proceeds derived from a sale of

assets under 11 U.S.C. § 363 on which assets it does not have valid, properly perfected liens.

DSP does not have a right to assert a credit bid on assets that do not secure DSP's allowed claim.

Accordingly, the Court will deny the Plaintiff's Motion for Summary Judgment.  The

Court will grant partial summary judgment in favor of the Debtors.

A separate order shall issue.


ENTERED:   April 14, 2014


_____/s/ Kevin R. Huennekens_____
UNITED STATES BANKRUPTCY JUDGE


ENTERED ON DOCKET
April 14, 2014